Filed 7/7/23  In re J.J. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J. J., a Person Coming Under the Juvenile Court Law. | B322284 |
| | (Los Angeles County Super. Ct. Nos. 18CCJP01157, 18CCJP01157B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>        Plaintiff and Respondent, <br><br>        v. <br><br> A.J., <br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Affirmed.

Paul Couenhouven, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother A.J. appeals from the juvenile court's order terminating her parental rights over her son, J., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  She argues that the trial court erred in denying her section 388 petition on the grounds that she failed to show that reinstating her reunification services was in the child's best interests.  We find no error and affirm the trial court's order.

### BACKGROUND
## I.  Prior Dependency History

Mother has six children, E. (born 2011), H. (born 2013), Z. (born 2014), J. (born 2018), D. (born 2020), and C. (born 2022).[2]  Mother had an extensive history with the Los Angeles County Department of Children and Family Services (DCFS) as a minor and then as a parent.  In 2011, DCFS filed a petition alleging that mother placed E. in a dangerous situation by leaving him in the care of maternal grandmother, who had a long history of illicit drug use.  The petition also alleged that mother had mental and emotional problems and was involuntarily hospitalized, and

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] This appeal concerns only J.  The identity of J.'s father (father) is unknown and he is not a party to the appeal.  We discuss details regarding mother's other children where helpful for background or relevant to the appeal.

2

that E.'s father failed to provide the child with necessities including food and shelter. Mother was still a minor at the time and E. was only six weeks old. E. was removed from mother, her reunification services were terminated, and the child was adopted. In 2013, DCFS filed a petition on behalf of H. shortly after the child's birth, alleging that mother admitted to using marijuana the day prior to giving birth, and had a history of aggressive behavior and untreated mental health issues, including bipolar disorder and depression. H. was removed, reunification services were denied, and the child was adopted.

In 2016, DCFS received a referral for Z. alleging physical and emotional abuse by mother. The referral alleged that mother became verbally aggressive toward Z.'s father, Robert, and threatened to kill herself. DCFS closed the referral as inconclusive after failing to contact mother.

## II. Referral and Petition

The instant case arose in January 2018, when mother presented at the emergency room with "a depressed and flat affect." Mother stated that she had no support at home and could not care for Z. (then three years old) because mother slept all day. Mother was 36 weeks pregnant with J. and stated that she had not had any prenatal care because she did not feel like it and did not know if she wanted to keep the child.

A DCFS children's social worker (CSW) met with mother in the hospital. A nurse told the CSW that mother was on morphine for pain and might be a little tired. Mother stated that her pregnancy was due to a rape; she did not provide father's identity. Mother reported that she had been feeling depressed due to the pregnancy, but intended to keep the baby and could

3

care for the baby and Z.  Mother told DCFS that she used marijuana edibles. She denied mental health or substance issues.

Mother gave birth to J. in February 2018.  Two days after the birth, the hospital's medical social worker told the CSW that hospital staff was concerned that mother might not wake up to feed the baby once discharged.  She stated that mother was a deep sleeper and her medication was making her drowsy. Mother confirmed that the medication was causing her to sleep deeply, but stated that she had support at home from Z.'s father and her roommate, and was capable of feeding J. on a schedule.  The following day, J.'s doctor reported that mother did not want to wake up to care for or feed the baby, and that mother had fallen asleep while feeding J., which caused J. to choke.

The court granted a warrant to remove Z. and J. from mother's care on February 16, 2018. Z. remained with her father, while J. was placed in foster care.

DCFS filed a dependency petition on February 21, 2018 on behalf of Z. and J. under section 300, subdivisions (b)(1) and (j).[3] In counts b-1 and j-1, the petition alleged that mother had "mental and emotional problems, including a diagnosis of Bi-Polar Disorder, Post-Traumatic Stress Disorder and depression,"

_____

[3] Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  . . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child. . . .  [¶] (j) The child's sibling has been abused or neglected . . . and there is a substantial risk that the child will be abused or neglected."

4

which rendered mother incapable of caring for the children. The petition further alleged that mother failed to take her psychotropic medication as prescribed and that E. and H. previously received permanent placement services due to mother's mental and emotional problems. Counts b-2 and j-2 alleged that mother had a history of substance abuse, including abusing marijuana during her pregnancy with J., and was a current user of marijuana, rendering her incapable of caring for Z. and J. Counts b-3 and j-3 alleged that mother had "demonstrated limitations" in her ability to care for J., including that on a number of occasions, mother "was unable to remain awake when the child required care." The petition further alleged that mother was "unwilling to follow medical advice to ensure the safe supervision of the child."

At the February 22, 2018 detention hearing, the court found a prima facie case for jurisdiction over Z. and J. under section 300. The court ordered Z. and J. detained; Z. remained placed with her father, Robert, while J. remained in foster care. The court ordered family reunification services for mother and monitored visitation three times per week.

In March 2018, J. was placed with maternal great-aunt (MGA), with whom mother was living. At mother's request and over DCFS's objection, the court allowed mother to continue to live with MGA as long as she was fully compliant with her medications, continued to see her psychiatrist and therapist regularly, and was not left alone with the child.

## III. Jurisdiction/Disposition Report

In its April 2018 jurisdiction/disposition report, DCFS reported that on March 14, mother called DCFS saying MGA was upset with her because mother had not been home for five days.

5

Mother got into an argument with MGA, then MGA's adult son threw mother against a wall.

MGA told DCFS that things had been going well with J. and mother, but then mother came back after being gone for six days, and she "seemed agitated and looked like she had been on the streets for days." Mother started to argue and MGA told her to leave so that things would not escalate in front of J. MGA told DCFS that she had not spoken to mother since, but noted that mother left her psychotropic medication behind. MGA opined that mother was not capable of caring for any of her children.

DCFS reported that J. was doing well with MGA. Mother was visiting Z. regularly but had not visited J. since leaving MGA's home. DCFS recommended sustaining the petition with no family reunification services for mother.

## IV. Adjudication and disposition

At the June 2018 adjudication hearing, the court sustained the petition, exercising jurisdiction over Z. and J. under section 300, subdivisions (b) and (j), and finding that removing the children was necessary.

The court ordered monitored visitation for mother and ordered DCFS to set up a written visitation schedule. The court continued the matter for disposition.

In August 2018, DCFS reported that mother had not maintained contact with the department. Attempts to reach her at her last known address and phone numbers were unsuccessful. Thus, DCFS was not able to assess mother's progress or generate a visitation schedule.

At the disposition hearing in August 2018, mother testified that her parental rights had been terminated as to E. and H. because she had no support and DCFS "wasn't trying to help me

6

. . . and they terminated my parental rights immediately." However, she acknowledged that she was offered reunification services for E., and that the case for those children lasted almost four years. As to J., the court denied family reunification services for mother per section 361.5, subdivision (b).[4] The court ordered monitored visitation for mother and ordered DCFS to establish a written visitation schedule.

## V.    Termination

DCFS filed a section 366.26 report in December 2018, reporting that J. was placed with maternal great-cousin (MGC) and her husband after MGA became ill. J. appeared very bonded with them, but DCFS could not approve them for permanent placement because of MGC's husband's criminal history. DCFS reported that mother visited J. once in June and then eight times in September through November. Mother was generally appropriate and attentive during visits. She was affectionate and J. responded by smiling and laughing. Mother fed and changed him without assistance.

In a January 2019 status report, DCFS stated that mother had remained in contact with the department during this period and had been visiting J. Mother attended 18 visits between August 2018 and January 2019. DCFS reported that mother usually attended visits with Z. and mother's boyfriend, Duane. Mother's "behavior has improved and [she] has become more friendly and open." Mother's behavior with J. was always

---

[4] Section 361.5, subdivision (b) permits a court to deny reunification services upon a finding by clear and convincing evidence that, as relevant here, the parent failed to reunify with a sibling or half-sibling of the child, resulting in termination of reunification services and/or parental rights for that sibling.

7

appropriate, she was able to soothe him and attend to his needs. Mother expressed her desire to regain custody of J.

The court ordered adoption as the permanent plan on February 13, 2019. DCFS sought to place J. with a prospective adoptive family, given the issues with permanent placement with MGC and her husband. At the request of counsel for J., the court ordered J. not to be removed from MGC's custody without noticed hearing or exigent circumstances, and ordered DCFS to assess MGC for legal guardianship.

In July 2019, DCFS reported that MGC was appealing the denial of approval of her home for adoption. J. was happy, healthy, and strongly bonded to MGC and her family. Mother had been seeing a therapist and psychiatrist weekly since November 2018. Mother was regularly attending her visits with J. and was interactive and engaging during the visits.

In a last-minute information filed September 25, 2019, DCFS reported that mother continued to visit with J. once per week, monitored by MGC. The visits were going well, mother was appropriate in playing with J., changing his diaper, and feeding him. There were no concerns reported. DCFS recommended that the court lift the do-not-remove order and refer J. for adoptive matching.

At multiple hearings throughout 2019, the court denied DCFS's request to lift the do-not-remove order, and continued the contested permanency planning hearing pending resolution of MGC's appeal regarding the adoption. MGC's appeal was dismissed in December 2019.[5]

---

[5] MGC submitted a request to reopen her appeal in early 2020. The do-not-remove order remained in effect until June 2021.

Mother filed a section 388 petition (form JV-180) on January 29, 2020. She requested that the court change its order denying her family reunification services. In the section regarding changed circumstances, mother stated that she had engaged in mental health counseling and an outpatient program since of November 2018. She also stated that she had completed a mental health assessment and started a treatment plan. She requested that the court grant unmonitored visits, including overnights and weekends, and/or return J. to her custody. She stated that it was in J.'s "best interest to be reunited with his now stable mother."

The court set the section 388 petition for a hearing and ordered DCFS to file a responding report. The hearing and the permanency planning hearing were continued due to the COVID-19 pandemic.

In a December 2020 report, DCFS stated that mother and Duane had moved into a new apartment together in May 2020, and since then their relationship had been "very rocky." Mother gave birth to D., her child with Duane, in June 2020. In July 2020, Duane was granted sole custody of D. DCFS reported that mother had verbally threatened and physically struck Duane and Renee, D.'s paternal grandmother who was monitoring mother's visits. Mother also ran into a retaining wall with D. in the car following a disagreement with Duane. After Renee filed a restraining order against mother, the court suspended mother's visits with D.

Mother continued to have weekly monitored visits with J. and was "very interactive and engaging" with the child. However, DCFS expressed concerns with mother's mental state and behaviors in late 2020, as she was the subject of six referrals

9

with allegations of general neglect as to Z., J., and D. DCFS also noted that mother had also been involved in multiple domestic violence incidents with Duane.

In October 2020, DCFS filed a section 300 petition regarding D., alleging general neglect by mother and Duane.  D. was removed from mother and Duane and placed with Renee. That same month, mother's therapist reported that mother had not continued with her weekly therapy sessions.  The therapist told DCFS that she had not seen or heard from mother since August, and prior to that time, the counseling sessions were inconsistent.  In December 2020, DCFS reported that mother had not been in contact with the department in over a month and efforts to contact her were not successful.

On December 29, 2020, the court denied mother's section 388 petition following a hearing, finding no change in circumstances.  The court continued the permanency planning hearing to June 2021.

On April 1, 2021, DCFS received a call from mother's neighbor reporting that she heard mother "screaming and cussing" at J.  The CSW then found a video posted online recording the incident.  As described by the CSW, on the video a woman could be heard yelling, "Look at that TV, and I will whip that ass!  Face the wall!"  A child is then heard screaming, with sounds of a person or object being struck repeatedly and a woman's voice stating, "Bring your ass over here!  Stop fucking running! . . .  You're three years old bro!"

DCFS concluded that MGC had violated the court's orders by allowing mother unlimited access to J., including unmonitored, overnight visits at mother's home.  Consequently,

DCFS detained J. and Z.[6] and placed them both with a foster family (the A. family). DCFS reported that these allegations were later substantiated.

DCFS reported that mother had minimal contact with J. after he was placed with the A. family. Mother's visitation schedule included one in-person visit per week and virtual contact every day during a set window of time. However, mother had only two virtual visits in April 2021 and one in-person visit, during which the caregiver reported that mother seemed distant from J. and paid more attention to Z. The caregiver also stated that mother had not made herself available for Facetime calls. Additionally, mother had not made herself available to make a statement to DCFS during this period.

On June 1, 2021, the A. family stated that they could no longer care for J., as his behaviors were escalating and they were moving. At a hearing on June 29, 2021, the court lifted its prior do-not-remove order, allowing J. to proceed to adoptive matching. The court continued the permanency planning hearing.

In June 2021, J. was placed into the home of prospective adoptive parents Ms. Y. and Mr. C. (the Y. family). In a report filed in October 2021, DCFS stated that J. was doing well with the Y. family and appeared bonded to them. The Y. family expressed a desire to adopt J.

---

[6] Previously, the court had terminated jurisdiction over Z. with a family law order giving Robert sole physical and joint legal custody. Mother continued to have monitored visitation with Z., but Robert had allowed mother to have unmonitored visitation in violation of the court's orders. Following this incident, Z. was removed from both mother and Robert.

11

Mother had two in-person visits in August 2021. During a visit on August 11, 2021, J. greeted mother and Duane by calling them "mom" and "dad" and hugging them.  The CSW, Wade Shinn, observed J. throw sand at mother, who responded, "Stop throwing that shit at me I will throw it back," and also stated, "Don't you fucking dare throw that again."  The second visit, the following week, was monitored by Renee, D.'s paternal grandmother, and included J., Z., and D.  Renee reported no concerns with mother's interactions with J.  CSW Shinn reported that visits were then put on hold due to an "unexpected family tragedy," but were scheduled to resume on September 29, 2021.

In October 2021, the court continued the permanency planning hearing to January 2022 to allow J. to meet the adoption criteria of living with the Y. family for six months.  At the request of mother's counsel, the court also ordered DCFS to provide an update as to mother's visitation.

In a status review report filed in December 2021, DCFS stated that J. continued to appear comfortable with the Y. family and was bonding with them. Ms. Y reported that J.'s tantrums had decreased.  The Y. family remained committed to adopting J.

DCFS reported that since the last hearing in October, monitored visits with J. stopped because mother changed her phone number and did not provide the new number to DCFS.  The CSW was able to obtain mother's number from Renee on November 18, and visits resumed on November 22, 2021.

At a hearing on February 8, 2022, the court continued the permanency planning hearing at the request of J.'s counsel.  Mother's counsel asked the court to order DCFS to facilitate visitation and to provide a written schedule, noting that there had been a "delay" in visits for the past month and a half.  The

court ordered DCFS to file an update regarding visits and to provide a written visitation schedule for mother.

CSW Shinn monitored a visit between mother and J. on February 12, 2022. CSW Shinn reported that upon arrival, J. did not acknowledge mother, but ran to hug Z. The CSW also reported that mother was visibly pregnant. J. played with Z. for most of the visit, and mother watched from a distance but "participated when physically capable." The CSW observed that mother paid most of her attention to D.

Mother contacted CSW Shinn on February 21, asking about visits. He informed mother on March 1, 2022 that he was attempting to acquire a monitor or to rearrange his own schedule if necessary. The next scheduled visit occurred on March 5, 2022. Mother had given birth to C., her second child with Duane, a few days prior. During the visit, mother, J., and CSW Shinn went to a convenience store. CSW Shinn reported that, while exiting the store, mother was not holding J.'s hand and he began to run into the parking lot toward the street. Mother had no reaction to the incident and the CSW had to run to J. to stop him. Mother also did not hold J.'s hand walking through the parking lot or crossing the street, so the CSW did so. At the end of the visit, J. said he was tired and wanted to go home to the Y. family, whom he called "mom and dad." J. also referred to their adopted nephew as "my brother."

CSW Shinn texted mother on March 26 and April 2, 2022 to cancel visits due to family emergency and illness. Mother responded to the first text only. According to CSW Shinn, mother did not respond to his texts or calls on April 5, 8, or 11 to schedule makeup visits.

13

A Human Service Aide (HSA) was assigned to monitor visits in early April, with the first visit set for April 12, 2022. Mother did not respond until April 21, sending a text from an unknown number, asking "what is going on with my visits?" The CSW responded with the day, time, and location for weekly visits going forward and asked mother to confirm with the CSW or the HSA 24 hours in advance. The CSW stated that he scheduled the visits for a weekday as mother had previously requested, at Norman O. Houston park (Houston park). Mother responded on April 22 that Houston park was "too far" and that she could not make the selected day because she had to work. After mother failed to confirm monitored visits for three weeks, the HSA-monitored visits were terminated. Mother told the CSW that she wanted the visits on the weekend at a different park.

The CSW submitted a new HSA request for a monitor. The CSW contacted mother on May 18 to attempt to schedule a visit but mother became agitated and terminated the call.

In DCFS's May 2022 report, CSW Shinn stated that mother's contact with him had been sporadic since the February 2022 hearing, made from several different phone numbers. He also reported that mother failed to provide a current address and when asked about providing an updated phone number, mother responded, "I don't need to, it's your job to get it." Mother told the CSW that she was doing well, she was living with Duane, and was participating in anger management and domestic violence classes. She stated that DCFS was "trying to keep me away from my son." CSW Shinn explained that mother's refusal to provide updated contact information or to keep in contact with DCFS meant that he was unable to meet with mother to review and sign a written monitored visitation agreement. DCFS attached

an unsigned written visitation schedule, reflecting weekday visitation for two hours once per week.

DCFS also reported that mother was not granted family reunification services in the cases involving D. and Z. Mother also had an open case involving her youngest child, C. As to J., DCFS recommended terminating mother's parental rights and visitation.

Mother filed a second section 388 petition on May 24, 2022. She asked the court to return J. to her care, or to grant family reunification services and/or unmonitored and overnight and weekend visits. She stated that the change would be in J.'s best interests because J. would "benefit from the already established relationship with his mother."

In her accompanying declaration, mother stated that she had "participated in the recommended services and have been addressing the case issues that brought this matter before the Court." Mother stated that she completed 12 sessions of domestic violence classes on March 14, 2022 and 16 sessions of a parenting program on June 21, 2021. She also completed an anger management program with 21 sessions on January 17, 2022, and continued to participate in the program for support. She applied for mental health services and individual counseling, but stated that she did not qualify because she was not in crisis. She also did not qualify for a substance abuse program for her marijuana use. Mother stated she had tested negative for all substances three times since February 26, 2022. She declared that she was focused on being in her children's lives and would do anything to have them returned to her. As evidence of her progress, she pointed to the decision by DCFS to allow infant C. to remain in

15

her care. Mother attached certificates of completion for domestic violence program, parenting education, and anger management.

Mother also stated that the weekly visits with J. "have been difficult to schedule since my social worker has been consistently unavailable to monitor the visits or does not respond to my requests." She stated that she believed J. and D. would benefit from being returned to her care and "continuing to establish their relationship with their mother in the comfort and safety of our own home."

The court ordered a hearing on mother's petition and ordered DCFS to submit a response. DCFS filed a status review report on June 29, 2022. CSW Shinn reported that he attempted to contact mother on June 16 to schedule visitation but received no response. J.'s caregiver, Ms. Y., told the CSW that the visitation location requested by mother was too far to travel and requested weekday visits. Mother texted the CSW on June 17 stating that she could only visit J. on the weekend and that it had to occur at the park she had requested. DCFS concluded that it had accommodated mother's requests for visits, but mother continued to vacillate in her requests regarding an acceptable schedule and failed to maintain regular contact with DCFS.

DCFS filed a response to the section 388 petition on July 5, 2022. CSW Shinn stated that he spoke with CSW Jennifer Fregoso, who was assigned to D.'s case. CSW Fregoso stated that mother told her she worked nights Monday through Saturday, contrary to mother's statement to CSW Shinn that she worked Monday through Friday during the day. Fregoso also reported that mother did not visit consistently with D. and when she did visit, she spent the visit doing Z.'s hair. CSW Shinn also reported that when he attempted to contact mother in June by phone and

email to discuss visitation, mother responded by text, "I have already told you what I can do, and where I am comfortable doing the visit. I do not have to talk to you."

DCFS filed a last-minute information on July 12, 2022, reporting that on July 12, 2022, the CSW sent mother a new visitation schedule, with weekly visits occurring on Saturdays at a recreation area halfway between mother and the Y. family residence. Mother responded by text that "I told you where I wanted to have my visit," because it was near her other child's daycare and she did not "know if that's a safe area for my son and me to have my visit." DCFS concluded that mother "remains unwilling to work with the Department as to the location of the monitored visitation."

Mother submitted an exhibit list in advance of the section 388 hearing, including a declaration from Renee disputing CSW Shinn's description of the February 12, 2022 visit between mother, J., and J.'s siblings. Renee stated that J. hugged mother when she arrived, and that mother played with J. for most of the visit. Renee also denied telling CSW Shinn that she could no longer monitor visits.

Mother also attached excerpts of text message conversations with CSW Shinn,[7] including texts by mother on February 14 and 16, asking when she would have her next visit, and a response by Shinn on February 17 that he would call later that day, he was "trying to confirm dates." This was followed by texts from mother on February 18, 21, 23, and March 1, asking about visits. CSW Shinn responded on March 4 that there was a

---

[7] The phone numbers are not listed, but there appear to be text threads from at least two phone numbers used by mother.

visit scheduled for the following day. The visit proceeded on March 5.

The text chains also included texts from mother on March 11, 14, 16, 18 asking about visits. On March 18, mother stated that it would be the second week she had not seen J. On March 24, 2022, CSW Shinn texted that the next scheduled visit was set for March 26 at Houston park. Mother responded that she did not have gas to drive that far, and thought they were meeting at Lynwood park. CSW Shinn texted on March 26 that the visit scheduled for that day would be cancelled due to a personal family emergency, and that he would contact mother the following week to reschedule. Mother responded, "Ok." CSW Shinn also texted to cancel the visit on April 2, stating that he was not feeling well, and rescheduling for the following Saturday.

Mother texted on April 14 and 21, asking "what is going on with my visits," and noting that she had not seen J. in a month. CSW Shinn responded on April 22, stating that he had been attempting to reach mother using a different phone number for the past two weeks. CSW Shinn informed mother that he was "able to move the visit date and time," to Tuesday afternoons at Houston park, and asked mother to confirm with Shinn or the HSA. Mother responded that the park was too far and she could not have visitation on Tuesdays because she had to work. On April 28 and May 7, mother texted asking about visits.

The court held a hearing regarding permanency planning and mother's section 388 petition on July 13, 2022.[8] In support of

---

[8] In addition to issues regarding J., the court terminated jurisdiction as to Z., granting sole legal and physical custody to Robert, with monitored visitation to mother. The court also

her section 388 petition, mother testified that she suffered from postpartum depression after giving birth to D., which caused issues in her relationship with Duane, and acknowledged that there was domestic violence in their relationship.  She also acknowledged mental health issues and physical abuse as reasons for DCFS involvement, and testified that she had attended parenting, domestic violence, and anger management classes to address those issues.  Mother stated that she was trying to get back into therapy, but had not yet been approved.  Mother also detailed what she had learned in her classes.  In addition, mother testified that during their visits, J. would run to her, scream "mommy," and give her a hug.  She stated that during the last visit, J. said he missed her and wanted to come home.  She testified that she did not have any visits with J. from October 26 to December 22, 2021, and that in 2022, she had only had two visits.

During argument, mother's counsel stressed her completion of programs and her testimony regarding what she had learned in arguing that mother had shown a change of circumstances supporting her section 388 petition.  She argued that there had been no new domestic violence incidents  since December 2020 and that infant C. had been released to mother's care.  She also cited to evidence that J. loved and missed mother.

J.'s counsel argued mother had not established changed circumstances, noting that mother had stopped her therapy in 2021.  He also argued that granting the petition was not in J.'s best interests, given that mother had failed to consistently visit J. He argued that it was a consistent pattern for mother in failing to

---

terminated jurisdiction as to D., awarding a legal guardianship to Renee.

take advantage of any of the virtual visits offered or consistently attend in person visits, despite the length of the case. Counsel for DCFS also argued for denial of the petition, noting that mother had not consistently engaged in services regarding her mental health, despite that being an ongoing issue in multiple petitions. She also argued that mother had not established that a change would be in J.'s best interest, noting that although mother was focusing on recent issues with visitation, "there is a large portion of 2021 where mother was not actively visiting," and she had failed to maintain consistent contact with DCFS.

The court found that mother had demonstrated changed circumstances, noting that she completed several programs and was able to retain custody of C. However, the court found it would not be in J.'s best interest to grant the petition. The court observed that J. had spent more time outside mother's custody than in her custody. The court also noted that "the timelines for children of that age with respect to parents' compliance with their case plans are shorter," and although mother recently had begun to make an effort, it had less bearing on J.'s best interests given the long duration of the case. The court therefore denied the petition.

Turning to permanency planning, the court found that continued jurisdiction was necessary and by clear and convincing evidence that J. was adoptable. The court further found that no exceptions to adoption applied, as mother had not maintained regular visitation with J., had not established a bond with the child, and that any benefit from his relationship with mother was outweighed by the benefit received through the permanency and stability of adoption. The court noted that there was evidence of "some delays by the social worker in getting back to mom," but

20

that those issues arose "in 2022, and they come at the very end of a frankly prolonged period of this child not being in mom's custody, as well as coming at the end of a period in 2021 where mom did not have any visits or had very limited visits that started to grow shorter in frequency." The court therefore terminated mother's and father's parental rights. The court found it was in J.'s best interest to set adoption as the permanent plan and identified the Y. family as the prospective adoptive family.

Mother timely appealed the court's July 13, 2022 orders.

## DISCUSSION

Mother contends that the juvenile court erred in denying her second section 388 petition. She argues that DCFS failed to provide the weekly visitation ordered by the court after April 2021, therefore breaking the bond she had previously shared with J. and leading to the court's finding that granting the petition would not be in J.'s best interest. Mother urges us to reverse the denial of her section 388 petition and, consequently, reverse the termination of her parental rights. We find no abuse of discretion.

### A. *Legal Principles*

Pursuant to section 388, a parent may petition the juvenile court for modification of any previous order based upon changed circumstances or new evidence. (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) A parent may seek relief under section 388 even after the juvenile court has terminated family reunification services. "After reunification services have been terminated, it is presumed that continued out-of-home care is in the child's best interests. [Citation.] Section 388 allows a parent to rebut that presumption by demonstrating changed

21

circumstances that would warrant modification of a prior court order." (*Ibid.*)

To obtain modification of an order under section 388, the parent must demonstrate, by a preponderance of the evidence, both a change of circumstances or new evidence, and that the proposed change is in the best interests of the child. (*In re Alayah J., supra*, 9 Cal.App.5th at p. 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) In evaluating a section 388 petition, the juvenile court may consider factors such as "the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner." (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616; see also *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.) The analysis is a searching one; the court may consider the entire factual and procedural history of the case. (*In re Mickel O., supra*, 197 Cal.App.4th at p. 616.) "In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.'" (*Ibid.*)

"Once reunification services are ordered terminated, the focus shifts [from reunification] to the child's need for permanency and stability," and a presumption arises that "continued care [under the dependency system] is in the best interest of the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310.) After reunification services are terminated, inquiry into a child's best interests includes consideration of his or her need for permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526–527.)

We review the juvenile court's denial of a section 388 petition for abuse of discretion. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081.)

**B.** *Analysis*

Mother argues that DCFS's failure to provide her with court-ordered weekly visitation deprived her of her due process rights and "effectively predetermined" the court's denial of her section 388 petition. We disagree.

Mother focuses exclusively on the latter part of 2021 and the beginning of 2022, arguing that her "strong bond" with J. was broken due to lapses in visitation during that period. She points to several instances where CSW Shinn failed to timely respond to her text messages, cancelled visits, or failed to schedule them for several weeks.

There is evidence in the record to support mother's claim that some visits were missed due to communication issues on DCFS's part. However, mother ignores the evidence that she too bore responsibility for the lack of visitation. As documented by DCFS, there were multiple months when mother failed to respond to DCFS and failed or refused to provide updated contact information to the CSW. Indeed, after months of attempts by the CSW to secure an HSA to monitor visitation, mother repeatedly failed to confirm visits, resulting in cancellation of that monitor. CSW Shinn also documented his repeated attempts to work with mother and J.'s caregivers on a visitation schedule, which was stymied by mother's inflexibility regarding time and location of the visits. Tellingly, although mother had four and a half years of visitation, she never progressed beyond monitored visits. She cannot point to missed visits at the very end of that time period as the basis for her inability to strengthen her bond with J.

23

Additionally, we find that it was well within the juvenile court's discretion to conclude that mother's request for reunification services or custody was not in J.'s best interest. Notably, the court did not cite mother's visitation (or lack thereof) as a basis for this finding. Rather, the court was entitled to consider the entire record, including evidence that mother continued to struggle with addressing the issues that brought her before the court. Notably, although mother's brief argued that J.'s removal from MGC in April 2021 resulted in a breakdown in visitation, she does not include a discussion of her conduct precipitating J's removal. Specifically, mother violated the court's orders by having unmonitored visits with both J. and Z., then physically and verbally abused three-year-old J. to the extent that her neighbors called law enforcement and recorded video of the incident.

The court was also entitled to weigh J.'s interest in permanency and stability. At the time of the hearing on mother's petition, J. had been involved in the current dependency proceedings for four and a half years, since shortly after he was born. He had lived out of mother's custody for most of that time, had lived with the Y. family for more than six months, and was well-bonded to and comfortable with them. The court was not required to disrupt J.'s life at this late stage based on mother's belated claims here. (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 ["'[C]hildhood does not wait for the parent to become adequate.'"].) As the trial court found, the fact that mother was allowed to retain custody of C. at the beginning of his case helped to establish changed circumstances, but was not highly relevant to whether she had met her burden to demonstrate that it would be in J.'s best interest to delay permanency after more than four

years by reinstating reunification services.  (See *In re C.J.W.*, *supra*, 157 Cal.App.4th at p. 1081 ["there was no showing whatsoever of how the best interests of these young children would be served by depriving them of a permanent, stable home in exchange for an uncertain future"], citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

Mother's reliance on *In re Hunter S.* (2006) 142 Cal.App.4th 1497 (*Hunter*) is misplaced.  There, the five-year old minor was detained and placed with a grandmother while the mother was incarcerated.  (*Id*. at pp. 1500-1501.)  The mother maintained contact with the minor through monthly letters, complied with her case plan, and completed several programs while in prison. (*Ibid*.)  When the mother was released over a year and a half later, she entered a rehabilitation center where she attempted to maintain contact with the minor via phone.  The child began refusing to accept the mother's calls and stopped responding to her letters.  (*Id*. at p. 1501.)  The juvenile court ordered DCFS to set up "visitation for [the mother] as can be arranged through her [rehabilitation program." (*Ibid*.)  Although the mother persevered in her efforts to visit the child, he refused almost all contact with her and refused all visitation.  (*Id*. at p. 1502.) Although the mother and her counsel repeatedly informed the court during two years of proceedings that she had not seen her son, the court failed to rule on the mother's requests. (*Id*. at pp. 1502-1504.)  The juvenile court denied the mother's section 388 petition, terminated her parental rights, and found the child adoptable.  (*Id*. at p. 1504.)

The Court of Appeal concluded that the juvenile court had erred in granting the mother monitored visitation "as can be arranged." (*Hunter, supra*, 142 Cal.App.4th at p. 1505.)  The

court reasoned that "[w]hile the court granted visitation in theory, none was permitted in reality." The appellate court concluded that the effect of the juvenile court's order was to give the child "virtually complete discretion to veto visitation, and indeed all contact, with his mother, a discretion he exercised without any oversight or direction by the court. This was clearly improper. The juvenile court cannot impermissibly delegate to the child's therapist, DCFS or any third person, unlimited discretion to determine whether visitation is to occur." (*Ibid*.) The court further found that the juvenile court erred in denying the mother's section 388 petition, which was "the court's last opportunity to rectify three years of errors in failing to enforce the visitation orders, errors which led inexorably to erosion of the intimate bond [the mother] once shared with her son. (*Id*. at p. 1506.)

Here, by contrast, the court ordered weekly visitation for mother throughout the pendency of the case. As discussed above, although the record suggests some lapses by DCFS in its ability to provide weekly visits, mother also played a substantial part in the failure to comply with the court-ordered visitation. Mother also continued to have at least some visitation, but despite over four years of proceedings, she was never able to advance beyond monitored visits. Thus, she has not shown that any error by the juvenile court or DCFS deprived her of the opportunity to establish a bond with J. such that she was entitled to reinstatement of her reunification services.

26

## DISPOSITION

The orders denying mother's section 388 petition and terminating her parental rights are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

CURREY, ACTING, P.J.

ZUKIN, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.